Argued November 3, 1976, reversed and remanded April 19, petition for rehearing denied June 1, 1977

JAMES, *Respondent,*
*v.*
CARNATION COMPANY et al, *Appellants.*
(No. 407768, SC 24361)

562 P2d 1192

[ 66-a ]

Edwin J. Peterson, Portland, argued the cause for appellants. With him on the briefs were Charles R. Holloway III, and Tooze, Kerr, Peterson, Marshall & Shenker, Portland.

John R. Faust, Jr., Portland, argued the cause for respondent. With him on the brief were Hardy, Buttler, McEwen, Weiss & Newman, and Jerome E. LaBarre, P.C., Portland.

Before Denecke, Chief Justice, and McAllister,* O'Connell,** Holman, Howell, Bryson, and Bohannon, Justices.

BRYSON, J.

---

*McAllister, J., retired December 31, 1976
**O'Connell, J., term expired January 3, 1977.

## BRYSON, J.

Plaintiff Martha R. James brought this action against the Carnation Company and its driver employee to recover damages for personal injuries suffered in a motor vehicle accident on US Highway 26. The jury returned a verdict finding defendants 63 percent negligent and plaintiff 37 percent negligent. Judgment was entered in plaintiff's favor. Defendants appeal.

■   Included among defendants' numerous assignments of error is the denial of their motion for a nonsuit and motion for a directed verdict. When determining the propriety of a motion for nonsuit or a directed verdict, we view the facts in a light most favorable to the plaintiff. *Scott v. Mercer Steel/Edwards Realty,* 263 Or 464, 466-67, 503 P2d 1242 (1972).

The accident occurred at approximately 6:30 a.m. on September 28, 1972, when plaintiff, driving westerly on US Highway 26 on her way to work, drove her automobile into the rear of defendants' disabled delivery truck. The truck was parked approximately 458 feet west of the US 26 exit to the zoo, in a paved area to the right of the three lanes marked for normal traffic.[1] Official sunrise that day was 7:05 a.m. and weather conditions were described as cloudy or overcast. Witnesses who drove past the scene of the accident reported that the truck was visible at a

---

[1] US Highway 26 is a main highway connecting Portland with the coast and servicing Portland's western suburban areas. At the accident location the highway speed is posted at 50 miles per hour and consists of three lanes in each direction, plus an additional paved area which is separated from the northerly most lane by a solid white "fog line." This additional paved area was variously described by witnesses as a "shoulder," "emergency parking area," "auxiliary lane" or "slow down" lane. Evidence was introduced that trucks and slow-moving vehicles used this area for travel.

Two hundred feet east of the collision is a "channelized island" outlined by an eight-inch white stripe and crossed with white chevrons. This island is designed to prevent motorists from crossing over the zoo exit and onto the auxiliary area.

distance of some 500 feet; however, one witness testified:

"Q Could you see people or vehicles clearly at a distance of 500 feet without lights at that time?

"* * * * *.

"A I don't believe so."

Witnesses also testified that they saw no lights on the truck and that most of the other cars then using US 26 had their lights on. The weather was "overcast" and the pavement was dry.

There was expert testimony that the truck, though relatively large[2] and painted red and white, would be difficult to see in early dawn light. The truck was equipped with reflectors.

Plaintiff suffered brain damage and amnesia as a result of the accident and had no recollection of the accident or the events leading up to it. Stevens testified that he did not see or hear plaintiff's car until it struck his truck.[3] There is no direct evidence as to how long plaintiff had been driving in this auxiliary area before she ran into defendants' truck, why she was using it, or whether she did or did not see the truck. Expert opinion was offered that the design of the exit from US 26 to the zoo is such as to mislead motorists off of the main highway and into the area where defendants' truck was parked.

A police officer who arrived shortly after the accident testified that he observed no skid marks, and expert testimony placed plaintiff's speed at the moment of impact at between 32 and 41 miles per hour.

---

[2]The truck is seven feet nine inches wide and ten feet four inches high.

[3]An accident report prepared by defendant Stevens for his supervisor at the Carnation Company contradicts his testimony that he did not see or hear plaintiff's car prior to its impact with the truck. But, in that report Stevens also reported that plaintiff was driving towards his truck at approximately 50 miles per hour and that she made no attempt to avoid the collision or to stop or slow her vehicle prior to impact.

At the time of the accident, Stevens, the driver, was sitting on a bank to the north of the truck. He had returned from telephoning the garage for assistance.

Plaintiff's expert further testified that the wheels of plaintiff's car showed no evidence of braking. At the moment of impact plaintiff's car was north or to the right of the "fog line," just inches from the nine and one-half inch high curb bordering the north side of the auxiliary area.

Defendants' motion for a nonsuit was as follows:

> "* * * I move the Court for a judgment of nonsuit on the grounds and for the reason there is no evidence proving, or tending to prove that the defendants were negligent in any of the respects charged by the plaintiff; and two, that there is no evidence proving, or tending to prove that, assuming there is evidence of negligence, that in any way it was a material or substantial cause of the accident. * * *"

Defendants' motion for a directed verdict is supported by essentially the same argument. The examination of evidence to determine if there is any substantial evidence, both as to negligence and causation, from which a jury could reach a verdict in favor of the plaintiff is one of the most difficult tasks for a trial or appellate court. An examination of our numerous cases on this issue shows that the question of the evidence in each case is so diverse that decisions are reached almost on an ad hoc basis. This case is complicated by the plaintiff's inability to testify.

Nevertheless, a nonsuit or directed verdict should be entered only in exceptional cases where, from the facts, reasonable men could draw but one inference and that inference supporting the conclusion that defendants were not negligent; or that defendants' negligence was not the factual or legal cause of plaintiff's injury. *Law v. Kemp,* 276 Or 581, 556 P2d 109 (1976); *Oregon Auto. Ins. Co. v. Fitzwater,* 271 Or 249, 259, 531 P2d 894 (1975); *Carlson v. The May Dept. Stores,* 270 Or 289, 292, 527 P2d 252 (1974); *Cutsforth v. Kinzua Corp.,* 267 Or 423, 432, 517 P2d 640 (1973); *Skeeters v. Skeeters,* 237 Or 204, 214, 389 P2d 313, 391 P2d 386 (1964); *Eitel v. Times, Inc.,* 221 Or 585, 592-95, 352 P2d 485 (1960); *Ellenberger v. Fremont Land Co.,*

165 Or 375, 385-86, 107 P2d 837 (1940). We examine the facts to determine whether there was sufficient evidence from which, if believed, the jury could probably find negligence on the part of the defendants and that such negligence caused the accident and injuries. See dissenting opinion in *Berg v. Mengore,* 271 Or 530, 538, 533 P2d 801 (1975).

■ In the present case, there is evidence from which a jury could reasonably conclude that it was more likely than not that both plaintiff and defendants were negligent. It was testified that the accident occurred more than one-half hour before sunrise;[4] that most vehicles using the highway at that time had their lights on; that an object such as the truck would be difficult to see in the pre-dawn light; and that the truck did not have its lights on.

■ This evidence may also support theories that factors other than the visibility of defendants' truck were the cause of the accident. However, as we noted in *Eitel v. Times, Inc., supra* at pages 592-96, it is not necessary that the plaintiff offer evidence eliminating all possible causes of the accident not involving defendants' negligence. It is sufficient that there be evidence from which the jury can determine that it is more probable than not that defendants' negligence was a "substantial factor" in causing plaintiff's injury.

In *Pattle v. Wildish Construction Co.,* 270 Or 792, 798-99, 529 P2d 924 (1974), we quoted from *Kaufman v. Fisher,* 230 Or 626, 639-40, 371 P2d 948 (1962), in part, as follows:

" '* * * * The determination of where the probabilities lie must, ordinarily, be made upon the basis of past experience as it is seen and appraised by the court. 'These are the judgments of 'common sense.' " 2 Harper & James, Torts § 15.2, p. 879 (1956).

" 'The process of judgment involves an examination

---

[4] ORS 483.420 and 483.402 require vehicles parked by the side of a roadway to display a red light visible 500 feet to the rear up to one-half hour before sunrise.

of the inventory of possible causes for an accident of the kind in question. Initially this inquiry is made by the trial judge in determining whether the case should be submitted to the jury. Upon the basis of his understanding of how accidents of the kind in question happen he decides where the probabilities lie. If he decides that the probabilities of non-negligent causes are as great or greater than the probability of a negligent cause attributable to the defendant he withdraws the case from the jury. * * * [If] the probability of the defendant's negligence is greater than the probability of other causes, the jury is entitled to reach the same conclusion, although it is not required to do so.' "

*See also Conger v. Dant & Russell, Inc.,* 250 Or 480, 484, 443 P2d 201 (1968). Although the decision is a difficult one, we conclude the trial court did not err in denying defendants' motions.

Defendants' second set of objections pertains to the applicability of ORS 483.456(2) (amended Oregon Laws 1975, ch 451, Sec 259), which provided:

"Whenever any motor truck, motor bus or truck trailer is disabled during the period when lighted lamps must be displayed on vehicles and such vehicle cannot immediately be removed from the main-traveled portion of a highway outside of a business or residence district, the driver or other person in charge of the vehicle shall cause such flares, lanterns or other signals to be lighted and placed upon the highway * * *."

The trial court took "judicial notice" that the accident occurred "outside of a business or residence district" and instructed the jury accordingly. But the court instructed the jury that if they found the auxiliary area in which defendants' truck was stopped to be a "main-traveled portion of a highway," the defendants would be presumably negligent in failing to set out warning lights. Defendants argue that ORS 483.456(2) is inapplicable as a matter of law to the facts of this case because (1) the accident did not occur "outside of a business or residence district," and (2) the

truck was not parked on the "main-traveled portion of a highway."[5]

■ First, the question of statutory meaning and legislative use of the words "outside of a business or residence district" and "main-traveled portion of a highway" is a question of statutory interpretation and, as such, is decided by the court as a matter of law.[6] In *Pio v. Adcco, Love's Enter./Kent,* 267 Or 540, 543, 517 P2d 1189 (1974), we observed that "[s]tatutes are to be construed so as to carry out the intent of the legislature." *See also Parr v. Dept. of Rev.,* 276 Or 113, 116-17, 553 P2d 1051 (1976).

■■ In determining legislative intent, the court should consider the object to be accomplished. *Cudd et al v. Aschenbrenner,* 233 Or 272, 377 P2d 150 (1963). A statute should, if possible, be construed so as to avoid

---

[5] Plaintiff raises a preliminary challenge that defendants' assignment of error protesting the trial court's decision to take judicial notice that the accident occurred "outside of a business or residence district" does not satisfy the requirements of ORS 17.510, which provides as follows:

"No instruction given to a jury in the circuit court shall be subject to review upon appeal unless its error, if any, was pointed out to the judge who gave it and unless a notation of an exception was made in the circuit court. It shall be unnecessary to note an exception in the circuit court to any other ruling made. All adverse rulings except those contained in instructions given shall import an exception in favor of the party against whom the ruling was made."

The rationale set out in *Williams v. Ragan,* 174 Or 328, 337, 143 P2d 209 (1944), requiring a formal exception, is not applicable here. In this case defendants submitted a trial memorandum and made an offer of proof on the contested issue prior to the trial court's decision that it would take judicial notice of the character of the accident site and that the accident occurred "outside of a business or residence district." The record shows that there is considerable colloquy between the court and counsel regarding the points now raised by the defendants in this appeal. It cannot be said that the trial court was not well apprised of defendants' position on the issue before making its ruling. In addition, defendants requested jury instructions defining "business district" and "residence district." Both of the requested instructions were inconsistent with the trial court's decision, and defendants also assign the failure of the court to give the requested instructions as error in this case. We conclude that the defendants' objections were properly taken and called to the court's attention.

[6] *See Staples v. Senders,* 164 Or 244, 96 P2d 215, 101 P2d 232 (1940); *Rogers Const. Co. v. Hill,* 235 Or 352, 357, 384 P2d 219 (1963); *Dungey v. Fairview Farms, Inc.,* 205 Or 615, 617, 620, 290 P2d 181 (1955).

absurd or unreasonable results. *Hollinger v. Blair/ Dickson,* 270 Or 46, 53-54, 526 P2d 1015 (1974).

Defendants rely upon the ORS 483.002(2)[7] and 483.020(1)[8] definitions of business district and residence district as support for their contention that the accident did not occur outside a business or residence district. These definitions would be controlling if we were determining the character of the areas contiguous to US 26, but they are of no aid in determining whether that highway is itself inside or "outside" of a particular district for purposes of ORS 483.456(2). To answer this question we must look to the purpose of the statute.

Several rationales support the ruling that the place of the accident was not in a "business or residence district." They include the slower speeds mandated in such districts and the increased lighting typically provided by street lamps and by the businesses and residences lining the roadway. Furthermore, motorists should not be surprised to come upon a vehicle stopped by the side of the roadway in business or residential areas and, consequently, may reasonably be expected to keep a close lookout for such obstructions.

None of these rationales support the exemption of a high-speed, controlled access arterial highway simply because that freeway happens to pass through a business or residence district. A freeway is, because of its greater speeds and limited access, functionally and structurally separate from the districts through which it happens to pass. The trial court acted correctly in

[7] ORS 483.002(2): " 'Business district' means the territory contiguous to a highway when 50 percent or more of the frontage thereon for a distance of 600 feet or more on one side, or 300 feet or more on both sides, is occupied by buildings used for business."

[8] ORS 483.020(1): " 'Residence district' means the territory contiguous to a highway not comprising a business district when the frontage on one or both sides of such highway for a distance of 300 feet or more is mainly occupied by dwellings, churches, public parks within cities or other residential service facilities or by dwellings and buildings used for business."

ruling that US 26, at the point of the accident, was "outside of a business or residence district."

Defendants next argue that even if the accident location was "outside of a business or residence district," ORS 483.456(2) would still not be applicable since the truck was, as a matter of law, not stopped on the "main-traveled portion of the highway." This too is, first of all, a question of statutory construction.

In *Goodman v. Layng*, 273 Or 1, 539 P2d 1047 (1975), we held the phrase "main-traveled portion of the highway" to include the entire paved surface of the highway when construed in relation to ORS 483.362(1). That statute prohibited parking upon a highway unless there was a clearance of at least 16 feet remaining upon the main-traveled portion of the highway.[9] But it is not necessarily required that the same phrase have the same meaning when it is used in different statutory contexts.[10] In interpreting this phrase we must, as before, look to the purpose of ORS

---

[9]The new Oregon traffic law, which went into effect July 1, 1976, requires only that a clear and unobstructed width of the highway opposite the standing vehicle be left for passage of others. The new statute neither specifies a particular width to be left clear nor uses the phrase "main-traveled portion of the highway." Oregon Laws 1975, ch 451, sec 95(3).

[10]The incongruity which would result if the definition in *Goodman v. Layng*, 273 Or 1, 539 P2d 1047 (1975), were applied across the board is apparent when ORS 483.303 (as it existed prior to July 1, 1976) is compared with ORS 483.362(1). ORS 483.303 provided as follows:

"On a highway that has only two lanes for traffic moving in opposite directions, when an overtaking vehicle being operated in conformity with ORS 483.102 does not have a clear lane for passing as required by subsection (1) of ORS 483.308, the driver of a slower-moving, overtaken vehicle shall, at the first opportunity, whenever sufficient area for a safe turnout exists, move the overtaken vehicle off the main-traveled portion of the highway until the overtaking vehicle is safely clear of the overtaken vehicle."

The new Oregon traffic law, Oregon Laws 1975, ch 451, sec 25, retains this requirement that slow-moving vehicles yield by moving off of the "main-traveled portion of the highway." It would be difficult to construe the legislative intent to have been to require slow-moving vehicles to drive completely off of the paved portion of the highway when an area such as the instant auxiliary area is available—and particularly where a rock wall makes it impossible to drive off the paved portion.

483.456(2), which we find to be significantly different from that pursued in ORS 483.362(1).

By enacting ORS 483.362(1), the legislature showed concern in assuring sufficient clearance for other vehicles to pass any vehicle stopped on the highway. Thus it was logical in *Goodman* to include the entire paved surface of the highway in determining the available clearance. The purpose of the instant statute is to warn drivers that a disabled vehicle ahead cannot be removed from the main-traveled portion of the highway and constitutes an unexpected hazard to traffic.

The phrase "main-traveled portion of a highway" is necessarily less inclusive than the unqualified word "highway," and in adopting this phraseology the legislature evidenced an understanding that there are some portions of a highway upon which a disabled vehicle should be able to stop safely without the necessity of posting warning lights. We conclude that this auxiliary paving, outside of the "fog line," is such an area.

The auxiliary area in which defendants parked their disabled truck does not look like and is not used as a normal lane of traffic. Set off by a solid white fog line,[11] and abutting directly against the curb without further markings, it is obviously different than and distinct from the other three lanes which carry traffic west out of Portland. Testimony was presented that this auxiliary area is used as an emergency parking area by disabled vehicles, as a stopping area for buses embarking and debarking passengers, and as a slow-moving vehicle pull-out. One driving in such an area should not be surprised to come upon stopped or slow-moving vehicles.

---

[11] Plaintiff's expert witness, Gerald Cysewski, a highway engineer, testified that a "fog line" is known in technical terms as a "pavement edge line." We have noticed before the significance of the fog line as a boundary marking the beginning of the trafficked portion of a highway. *See Grimes v. Johnson,* 266 Or 398, 401, 513 P2d 1138 (1973).

[ 75 ]

■ It would be logical for the legislature to reason, as we believe it must have, that there is no need to warn motorists if the truck is parked out of the flow of traffic in an area where high speed travel is inappropriate and where a reasonable driver would normally expect to come upon stopped or disabled vehicles. We hold, as a matter of statutory interpretation, that auxiliary paved areas, such as the one used by defendants along US 26, are not within the "main-traveled portion of a highway" for purposes of ORS 483.456(2) and that the trial court erred in submitting the meaning of "main-traveled portion of the highway" to the jury as a factual question.

■ A construction of statutory negligence shifts the burden of persuasion and requires the defendants to overcome the issue by proving they were acting as reasonable and prudent persons under the circumstances. *Freund v. DeBuse,* 264 Or 447, 451, 506 P2d 491 (1973). It would be speculation on our part to conclude that the jury based defendants' liability upon a common law duty of care and not upon the statutory duty required by ORS 483.456(2).

■ In view of the testimony that the truck was visible at a distance of some 500 feet,[12] it cannot be said conclusively that a reasonable jury would have found defendants negligent if there had been no instruction on the statutory duty imposed by ORS 483.456(2). We, of course, have no way of determining on what basis the jury determined the defendants 63 percent negligent and plaintiff 37 percent negligent. The jury could have found that the defendants were guilty of statutory negligence rather than common law negligence and, therefore, the trial court's instructing the jury on statutory negligence must be considered prejudicial

---

[12]Defendant driver Stevens testified that all of the lights were burning on his vehicle at the time the plaintiff struck the rear of the truck.

error.[13] In *Beglau v. Albertus,* 272 Or 170, 536 P2d 1251 (1975), we stated:

"Under the instructions on common law negligence, as given by the trial court, the jury found that defendant's negligence contributed 36 per cent to the accident. Under these circumstances, we agree with the trial court in its holding that plaintiff was prejudiced by its failure to give the instruction to which plaintiff was entitled in terms of the strong and mandatory requirements of the headlight statute, rather than in the more innocuous terms of a common law duty to 'illuminate his vehicle' when a reasonable person would do so. Had such an instruction been given the jury might well have found that defendant's negligence exceeded 50 per cent, rathern than 36 per cent." 272 Or at 187-88.

There are additional assignments of error but, because there is to be a new trial, we mention only those issues that are likely to arise again in substantially the same manner.

Several of defendants' assignments of error contend that the trial court erred in failing to sustain objections to the relevancy of plaintiff's evidence concern-

---

[13]The trial court instructed the jury as follows:

"Now, there's a statute, there's a statute that requires that an operator of a truck disabled upon a main traveled portion of a highway, to put out flares at any time and flags in the daytime at locations beside their truck and 100 to 300 feet in advance of said truck in such places that they will be clearly visible for a distance of 500 feet or more to approaching vehicles.

"Now, this is a jury question then, ladies and gentlemen, for you to decide because there has been conflicting evidence in respect to this, was this a main traveled portion of the roadway? I've been unable to find any case law that clearly defines whether this area between a fog line and a curb along a freeway is or is not a main traveled portion of the highway within the definition of the law, and for that reason, I am leaving that to your decision to make.

"If you find that this is a main traveled portion of the highway, taking into consideration the facts and circumstances of this case, then, in that event, the statute would be applicable. If you find that it is not, it would not be applicable, the statute. * * *"

The defendants excepted to the giving of the above instruction and the failure to give their requested instruction which stated, in effect, that the area to the right of the fog line and the three main-traveled lanes was not the "main-traveled portion of a highway."

ing the highway design and traffic patterns (referred to as custom and usage evidence) at the site of the accident. Defendants were granted two continuing objections:

> "[Defense counsel]: My position is that at the very least, until plaintiff puts on some evidence that to do, to travel in that area was legal or permissible, then they may not present evidence of custom and usage. There is no case directly in point. There are two Oregon cases listed there, but they do hold that custom and usage, in violation of a statute or ordinance, is irrelevant.
>
> "* * * * *.
>
> "[The Court]: * * * Your point is a troublesome point of law, because let's say we had a stop light in a rural area and everybody in Podunk County comes in and testifies that nobody out there stops at that light. I mean, can you show that custom and usage? Direct violation of the statute.
>
> "* * * * *.
>
> "I really think that the call that I am going to make is that you may show what the custom and usage is, because unless you can show that, you can't show whether she acted reasonably. So, that's the way I'm going to call it.
>
> "You have a continuing objection. * * *.
>
> "Anytime he puts in any evidence as to custom and usage, what that auxiliary lane, or emergency lane is used for, you have your objection."

In *Savage, Adm'x v. Palmer et al,* 204 Or 257, 272, 280 P2d 982 (1955), we held that evidence showing others to have violated certain traffic control signs was not relevant to the issue of whether the defendant was liable in a negligence action because of a violation of the same traffic control signs. At the time *Savage* was decided, the violation of the statute was considered to be negligence per se. The violation of a safety statute now carries the presumption of negligence but the party so charged may overcome the presumption by offering evidence of reasonable conduct. *Barnum v. Williams,* 264 Or 71, 79, 504 P2d 122 (1972).

16.   Also since *Savage,* this state has adopted the rule of

comparative negligence. Statutory negligence on the part of the plaintiff no longer forecloses her from recovery as a matter of law. The plaintiff may introduce evidence going to the design and traffic patterns in order both to overcome any presumption of negligence which might be placed on her and to demonstrate that her negligence was less blameworthy than that of the defendants. Furthermore, evidence of use of the auxiliary area, to the right of the fog line, would be relevant to prove that defendants were negligent at common law in failing to set out warning signals.

■ In view of the relevance of highway design and traffic pattern evidence, going to the issue of defendants' common law negligence, defendants' objection that plaintiff must present a foundation that she was actually using the lane for one of the purposes described by her witnesses is insufficient to warrant exclusion of this design and usage evidence.

■ Conduct and causation may be proven by circumstantial evidence. *Carlson v. The May Dept. Stores,* 270 Or 289, 292, 527 P2d 252 (1974). Although evidence of design and traffic patterns is generally relevant to the instant case, some of the evidence proffered by plaintiff is questionable. Plaintiff offered the testimony of a bus driver that he used the auxiliary area bordering US 26 on the right for slowing and stopping to embark and debark passengers (for the zoo, OMSI, etc.). This bus driver drove the route for the first time some 12 months after the accident. Plaintiff also offered testimony, which was received, of an engineering expert together with photographs and movies taken by him. The expert's testimony, photographs and movies were the product of observations made some 32 months after the accident and at a different time of the year and different hour of the day. Despite the fact that the accident occurred in the early morning hours on US Highway 26 when the traffic was leaving Portland, a time of relatively low traffic volume, the photographs and movies were taken between 4:00 and 7:45 on a

Friday evening, a time of intense highway usage. Defendants objected to the testimony of the bus driver and the highway expert and to the admission of photographs and movies taken by the expert on the grounds that they were not relevant as they do not relate sufficiently to the time of the accident.

In *Carter v. Moberly,* 263 Or 193, 200-01, 501 P2d 1276 (1972), we discussed the responsibilities of the trial judge in this area. Although the remoteness issue there was somewhat different than that involved here, it well states the applicable standard of review:

"In this case, the evidence in question was objected to as being too 'remote.' Such an objection requires the trial judge to assess the probative value of the proffered evidence, and to weigh the probative value against various considerations which may militate against admissibility, such as undue prejudice, introduction of collateral issues, consumption of undue time, or unfair surprise to the other party. McCormick on Evidence (2d ed 1972), 439-440, § 185. If he finds the evidence to have no probative value, he must exclude it. If, on the other hand, it does tend to establish a fact in issue, and no contrary considerations are present in the particular case, the evidence must be admitted. Between these two extremes, however, is an area in which further judgment must be exercised. If the evidence has some probative value, but also presents difficulties such as those mentioned above, the judge must determine whether the value of the evidence outweighs, or is outweighed by, the offsetting considerations. We sometimes call the exercise of this kind of judgment 'discretion.' Its exercise requires the judge to weigh the value of the evidence in light of all the circumstances of the particular case, and his conclusion, if it is reasonable, will not be disturbed on appeal. Precedent is of little value in reviewing such cases, because even when cases involve similar issues and similar types of evidence, the other factors which may properly influence the trial court's ruling are highly variable. We simply determine whether, on the facts of the particular case, the trial court's ruling was within the reasonable or permissible range. We need not determine whether his ruling was the only one possible. It may be that the record will support either admission or

exclusion; if so, the trial court's ruling will be affirmed, regardless of which solution we would prefer." (Footnote omitted.)

The court did not err in admitting the bus driver's testimony. Evidence was also offered to show the bus usage patterns had not changed since the date of the accident. Furthermore, the jury was properly cautioned that it could not take the evidence into consideration unless it found the bus usage patterns described by plaintiff's witness to be the same as those at the time of the accident. The trial court was also within its discretion in allowing plaintiff's expert to give his opinions regarding the highway design and usage of the auxiliary area. The difference between his time of observation and the time of the accident goes only to the weight of his testimony.

More difficult problems are presented by the difference in the surrounding circumstances depicted in the photographs and movies and that portion of the expert's testimony explaining what was observed in the movies. As has already been noted, the photographs and movies were taken in a period of heavy highway use, when traffic was leaving Portland on a Friday afternoon and evening. The accident occurred in the early morning hour during a period of relatively low use of the highway for traffic going out of Portland. If the sole purpose of this evidence was to describe the physical nature of the accident, a lesser problem would be presented by this discrepancy. *See Mason v. Allen et al,* 183 Or 638, 642, 195 P2d 717 (1948); *Burnham v. Eshleman,* 257 Or 400, 406, 479 P2d 501 (1971). However, some of this evidence might tend to prove more than the physical nature of the highway at the place and time of the accident. Although no evidence was offered on the difference or similarity of traffic conditions at the conflicting hours and days depicted, the trial court is usually allowed considerable discretion in deciding if such evidence should be received.

The problem is whether the relevance of the evi-

dence is outweighed as a matter of law by the tendency to mislead the jury as to the conditions existing at the time of the accident. Where such evidence is received, precautionary instructions should be given the jury and care should be taken that the evidence is not wrongfully "posed," 19 ALR2d 877, 879, or purely "experimental" in form. *See Western Feed Co. v. Heidloff,* 230 Or 324, 347-48, 370 P2d 612 (1962); *Loibl v. Niemi,* 214 Or 172, 179, 327 P2d 786 (1958). *See also, Comment, Demonstrative Evidence-Admissibility of Motion Picture and Wigwag Signal,* 47 Iowa L Rev 1138, 1140 (1962); *Note, Automobile Accidents - Photography - Expert Testimony,* 1 Will L J 596, n 1 at 598 (1961). Nevertheless, we are not prepared to say, in this case, that the court erred in this respect.

The defendants also contend the trial court erred in failing to grant their motion to strike the following allegation of negligence in plaintiff's complaint:

"1. In failing to carry and display any clearance lights on the rear of the Carnation truck as required by law."

The size, location and style of the clearance lights on defendants' truck is not contested. The only question on this issue is whether those lights met the statutory standards. ORS 483.414(4) provides:

"(4) Clearance lamps shall be mounted on the permanent structure of the vehicle in such a manner as to indicate its extreme width and as near the top thereof as practicable. Clearance lamps and side marker lamps may be mounted in combination, if illumination is given as required with reference to both."

The Department of Motor Vehicles (DMV) is the administrative agency charged with the administration of ORS chapter 483. Mr. Harvey Wood, a supervisor of the DMV, testified that the clearance lights used on defendants' truck satisfied the DMV regulations interpreting this statutory requirement.

In *Parr v. Dept. of Revenue,* 276 Or 113, 117, 553 P2d 1051 (1976), we quoted from *Curly's Dairy v. Dept.*

*of Agriculture,* 244 Or 15, 21, 415 P2d 740 (1966), as follows:

> " '* * * [T]he interpretation of an ambiguous statute by an agency charged with its administration is entitled to great weight, although it is not binding on the courts.* * *' "

There was evidence that the defendants' truck met the statutory requirements of ORS 483.414(4) and, under the statute and the regulations and interpretations of the DMV, there was no evidence to the contrary. Therefore, the above allegation of negligence should have been stricken.

Reversed and remanded for a new trial.